IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STANLEY H.R. EWAN, et al.,

      **Plaintiffs,**

      v.                                           CASE NO. 23-3234-JWL

UNITED STATES OF AMERICA,
et al.,

      **Defendants.**

## MEMORANDUM AND ORDER

Pro se Plaintiffs bring this action under 5 U.S.C. §§ 551 and 702, and 28 U.S.C. §§ 1331 and 2201. Plaintiffs are incarcerated at the United States Disciplinary Barracks at Fort Leavenworth, Kansas ("USDB"). The Court screened Plaintiffs' Complaint and entered a Memorandum and Order to Show Cause (Doc. 8) ("MOSC"), granting Plaintiffs an opportunity to show good cause why their Complaint should not be dismissed or to file an amended complaint to cure the deficiencies. Plaintiffs filed an Amended Complaint (Doc. 9). The Court screened the Amended Complaint and on March 25, 2024, entered a Memorandum and Order to Show Cause (Doc. 10) ("MOSC II") directing Plaintiffs to show good cause why the Amended Complaint should not be dismissed for the reasons set forth in the MOSC II or to file a second amended complaint to cure the deficiencies.

Plaintiffs Stanley H.R. Ewan, Jeffrey G. Barnes, Jr., and Norman Stout, filed a Second Amended Complaint (Doc. 11) ("SAC"). The Court entered a Memorandum and Order (Doc. 12) ("M&O") finding that the proper processing of Plaintiffs' claims could not be achieved without additional information from USDB officials, and ordered the preparation of a *Martinez* report. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th

1

Cir. 1991). The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiffs' claims under 28 U.S.C. § 1915A." (Doc. 12, at 6.) The *Martinez* Report (Doc. 15) (the "Report") has now been filed.

## I. Nature of the Matter Before the Court

The underlying facts are set forth in detail in the MOSC II. In summary, Plaintiffs bring claims regarding the rejection of publications, grooming standards, and abatement days not received by all USDB inmates. (Doc. 11, at 4.) Plaintiffs claim violations of Army Regulations and their First and Fifth Amendment rights. *Id*. As Count I, Plaintiffs Barnes, Ewan, and Stout, allege a First Amendment violation based on the rejection of their publications. *Id*. at 5. Plaintiff Ewan also alleges in Count I that the grooming standards at the USDB violate his freedom of expression/speech. *Id*. at 6–9. As Count II, Plaintiff Barnes alleges a Fifth Amendment violation based on the destruction of his rejected books. *Id*. at 9. As Count III, Plaintiff Ewan alleges a Fourteenth Amendment violation based on a new policy that allows abatement days for inmates completing treatment groups while denying the abatement to inmates that had previously completed the program. *Id*. at 9–10.

## II. Findings in the Court's MOSC II

The Court found in the MOSC II that although judicial review of agency action is available under the Administrative Procedures Act ("APA"), a "court must decline to adjudicate a nonjusticiable claim even if the defendant does not move to dismiss it under Fed. R. Civ. P. 12(b)(6)." (Doc. 10, at 5) (citing *Nauman v. Wormuth*, 2024 WL 776100, at *4 (D. Kan. Feb. 26, 2024) (citation omitted) (addressing justiciability in action seeking declaratory and injunctive relief under 5 U.S.C. § 702)). The Court also found that The PLRA's exhaustion requirement applies on its face to military prisoners like Plaintiffs. *Long v. Johnston*, 2022 WL 17177348, at

\*2 (D. Kan. Nov. 23, 2022) (citing *see* 42 U.S.C. § 1997e(a); *see also Murphy v. Hylton*, 2007 WL 1201517, at \*3 (D. Kan. Apr. 23, 2007) (military prisoner must exhaust under Section 1997e(a) regarding conditions at the USDB); *Marrie v. Nickels*, 70 F. Supp. 2d 1252, 1262-65 (D. Kan. 1999) (applying PLRA's exhaustion requirement in suit by military prisoner)). (Doc. 10, at 8.)

In addressing the Amended Complaint, the Court held in the MOSC II that:

> Plaintiff Ewan does not allege that the grooming policy impacted his right to freely practice his religion. *See Mitchell v. Annucci*, 2019 WL 3253192, at \*7 (N.D.N.Y. 2019) (claim that prison policy prohibiting designer corn rows violated prisoner's right to free expression was dismissed for failure to state a claim where prisoner failed to plead any facts suggesting he sought to maintain his long hair in braids as part of his religious expression or beliefs) (citing *see Betts v. McCaughtry*, 827 F. Supp. 1400, 1408 (W.D. Wis. 1993), *aff'd*, 19 F.3d 21 (7th Cir. 1994) (reasoning that the plaintiffs failed to articulate what message, if any, was intended by wearing sunglasses or caps indoors or explained [sic] that the wearing of long fingernails expresses a specific belief) (collecting cases); *see also Smith v. Bennett*, No. CV04-594, 2005 WL 1660824, at \*2 (D. Idaho July 12, 2005) ("The Court is unaware of any legal support for Plaintiff's claim that an inmate has a constitutional right to express himself through hair length.")).
>
> The Amended Complaint fails to provide any details regarding the grooming standards, what exception Ewan was seeking, or how the standards violated his freedom of expression. *See Mitchell v. New York State Dep't of Corr.*, 2012 WL 6204205, at \*11 (W.D.N.Y. 2012) (finding that where prisoner did not appear to have suffered any actual injury due to the application of the grooming policy, he lacked standing to challenge it); *see also New Rider v. Bd. of Ed. Of Indep. Sch. Dist. No. 1, Pawnee Cty., Okla.*, 480 F.2d 693, 699 (10th Cir. 1973), *cert. den.* 414 U.S. 1097 (1973) (noting that the Supreme Court rejected the contention that ". . . an apparently limitless variety of conduct [or appearance] can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea") (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

(Doc. 10, at 9–10.)

In the SAC, Ewan claims that the grooming policy requires shaving 7 days a week, hair not touching the ears, and mandatory hair cuts every two weeks. (Doc. 11, at 6.) Ewan states that

3

"[t]he way a person grooms themselves dictates society's perception of their character, intelligence, and personality." *Id*. at 7.  Ewan also now claims that he "has also requested a religious accommodation regarding the grooming standards for his firmly held beliefs, as an Agnostic, that mankind was created and as such Men are supposed to have facial hair since that is the naturally occurring hair pattern, whereas women are distinguished by not having facial hair." *Id*. at 8.

The Court also found in the MOSC II that Plaintiff Barnes does not have a cause of action under the Fifth Amendment regarding the destruction of his rejected books.  (Doc. 10, at 11.)  The Court found that the Takings Clause was not implicated because nothing suggests the books were taken for a public purpose.  *Id*.  The Court also noted that "although Plaintiffs assert in the Amended Complaint that the books were automatically destroyed, in the original Complaint Barnes asserts that when he was notified that he could go to the mailroom to catalog the books but would not be permitted to look through the books, 'Plaintiff decided to stay the course with the grievance and to reorder the books if necessary for this complaint.'" *Id*. at n.5 (citing Doc. 1, at 3).

Plaintiffs allege that the USDB has implemented a new policy on abatement days awarded for the completion of approved programs, and that it is only applying the policy to newly-arriving inmates.  Plaintiffs allege that current prisoners who have completed the programs are being treated differently than newly-arriving inmates who would be starting the programs after the new policy took effect.

The Court found in the MOSC II that Plaintiffs are not members of a suspect class, nor have they shown that eligibility to receive abatement days for the completion of programs involves a fundamental right.  *Id*. at 12–13 (citing *Durham v. Lappin*, 346 F. App'x 330, 333 (10th Cir. 2009) (unpublished) ("Prisoners are not suspect classes.") (citation omitted); *see also Tootle v.*

4

*Uitenham*, 103 F. App'x 337, 338 (10th Cir. 2004) (unpublished) (rejecting argument that application of the *Feres* doctrine to military prisoners creates a "suspect class of prisoners"); *Linton v. O'Brien*, 142 F. Supp. 3d 215, 219 (D. Mass. 2015) ("Inmates in the DDU are not a suspect class and access to good time credit programs is not a fundamental right."); *Abdul-Akbar v. Dep't of Corr.*, 910 F. Supp. 986, 1004 (D. Del. 1995) ("Prisoners are not a suspect class . . . [and] have no fundamental right to participate in rehabilitation programs . . . or to earn good-time credits."); *Pickett v. LeClaire*, 2009 WL 3320676, at *3 and n.1 (S.D. N.Y. 2009) (stating that prisoner "does not claim to belong to a suspect class or point to a fundamental right burdened by the decision to withhold good time credits" and noting that the case is distinguishable from situations where the prison revoked good time credits that were previously earned); *Tillman v. Woodall*, 2013 WL 4049977, at *5 (M.D. Tenn. 2013) ("The plaintiff's claims about participation in various prison programs do not implicate a fundamental right, because the plaintiff does not have a constitutional right to participate in prison programs and activities, or to sentence-reduction credits.") (citation omitted)).

    The Court found that because Plaintiffs have not alleged that their claim involves a suspect class or a fundamental right, rational-basis scrutiny would apply and the challenged policy need only bear a rational relationship to legitimate government ends. (Doc. 10, at 13.) The Court found that in *Turner*, the Supreme Court adopted a lower standard of scrutiny in evaluating the constitutionality of prison rules and regulations, in order to balance prisoners' constitutional rights with the deference due officials delegated the responsibility of administering prisons, and "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 14 (citations omitted).

The Court cited *Alexander v. Madden*, where the prisoner argued that the failure to apply the amendments to the Good Conduct Credit provisions retroactively violated his equal protection rights. *Id*. (citing *Alexander v. Madden*, 2018 WL 3126092, at *4 (S.D. Cal. 2018)). The court in *Alexander* found that it was not irrational for the department of corrections to choose against applying its new policy retroactively, as the department explained:

> A number of reasons support the department's determination that new and revised credit earning programs should be implemented prospectively. First, implementation of all the new and revised credit earning programs will likely affect the credit calculations of more than 80,000 inmates. To do so prospectively represents a major task for almost all of the divisions and branches of the department, but especially for the staff responsible for updating information technology systems, auditing release date calculations, and developing credit earning programs. To apply the credits retroactively would require significantly more time, staff, and resources.

*Id*. (citation omitted). In the SAC, Plaintiff Ewan argues that application of the new policy retroactively "would be fair and equitable and require very little effort by the USDB." (Doc. 11, at 10.) Ewan distinguishes this case from *Alexander* as follows:

> the instant case differentiates in two major ways: 1) There are only 400 inmates affected and not 80,000 and 2) The time to adjust each record, upon request, by an inmate would be a few minutes times 300–350 inmates. This amounts to less than a weeks['] worth of work, 29 hours, for one staff member. By not treating all inmates equally they promote a situation where there is favoritism shown and hostility between the old and the new. This increases the chance for violence and animosity amongst the population.

*Id*.

### III. The Report

The Report provides that all three plaintiffs agreed to participate in interviews and were interviewed via telephone. (Doc. 15–1, at 5–6.)

### A. Rejected Publications – Counts I and II

Regarding publications, the Report provides that the policy and regulation Plaintiffs are challenging regarding publications is no longer in effect. *Id*. at 8. The USDB issued an updated MCC Regulation 28–1 on May 7, 2024. *Id*. The Report provides that During Plaintiff Ewan's interview:

> he stated that after his appeal was denied, he shipped the books to a "paralegal" office where he pays for the books to be held. Ewan also stated that he did not file a DD 510 complaining about the policy, but he did submit an appeal to the PAB. Ewan stated that he was familiar with the change in policy that occurred on May 7, 2024, and that he requested the paralegal office ship the books back to the facility, but the office has not yet done so. Ewan also stated that he has no facial complaints regarding the new policy, which he said "appears to be valid." Since the change in policy, Ewan has ordered five books and none of them were rejected, including *Sexy Strangers: Erotic Stories* by Rachel Kramer Bussel, and *Best Women's Erotica of the Year, Vol. 9* by Rachel Kramer Bussel, et al. Both of which Ewan feels might have been rejected under the prior policy.

*Id*. at 12–13.

During Plaintiff Stout's interview, he stated that:

> he did not order any other books related to the SAC and that he has had a few books denied previously but couldn't remember the titles. Stout stated he was aware of the policy change that occurred on May 7, 2024, but had not tried to reorder *Secret Treaties*, or any other books, since the change.

*Id*. at 17.

The only claims raised by Plaintiff Barnes in the SAC relate to the rejection and subsequent destruction of certain publications. *Id*. at 13. The Report provides that during Barnes's interview, he claimed "that a staff member erroneously informed Barnes he had fourteen (14) days to make an election [as to whether to ship the rejected books or to have them destroyed] before the books were considered abandoned property," *Id*. at 15. The Report provides that:

7

> The MCC Reg. 28-1 does not provide a specific timeline regarding when rejected mail will be considered abandoned property. The regulation states that if the inmate fails to make an election to either ship the rejected mail or have the mail destroyed, the "items will be treated as abandoned or unclaimed property and disposed of." MCC 28-1 at 3-6(b) (2024 & 2021). The paperwork from the PAB demonstrates that Barnes refused to make an election on July 21 and twice on July 27, 2023. Ex. I.

*Id*. at 16.  The Report further claims that because the books were considered contraband, Barnes did not have any property interest in the books.  *Id*.  (citing *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006)).

The Report provides that:

> Based on the interviews with Plaintiffs, the May 7, 2024 change in policy appears to have mooted the Plaintiffs' challenge to the previous policy. And it appears that the Plaintiffs' complaints about the old policy do not apply to the new one. In any event, any challenge to the new policy is not ripe because the publications listed in Plaintiffs' SAC have not been blocked by the new policy.

*Id*. at 18.  The Report provides that even if the issue regarding publication is not moot, the new regulation—as the prior version was found to be—is rationally related to legitimate penological interests.  *See id*. at 22–23.  The Report also provides that there is no final agency action regarding the new policy for purposes of a claim under the APA.  *Id*. at 23–24.

### B. Grooming Standards – Count I

Plaintiff Ewan is the only plaintiff making a claim regarding the grooming standards at the USDB.  The Report provides that Plaintiff Ewan failed to exhaust his administrative remedies regarding this claim.  The Report provides that:

> there is nothing in Ewan's file to demonstrate that he submitted a DD 510 to lodge a grievance against the USDB grooming policy based on an alleged infringement of his freedom of speech. Ewan did apply for and was denied an exception to the grooming policy based on his claimed religious accommodation. Ewan, however, failed to exhaust all of his administrative remedies with regards to

8

    the denial of his RAR. Thus, the Court should find that Ewan has not yet exhausted his administrative remedies with respect to his challenge to the grooming standards.

*Id*. at 26.

  The Report also argues that the claim is not justiciable under the two-part test set forth in the Court's M&O. *Id*. at 26–27. In the M&O, the Court cited *Nauman v. Wormuth*, prescribing our Circuit's two-part test to determine whether a military plaintiff's claim is justiciable. (Doc. 12, at 3–4) (citing *Nauman v. Wormuth*, 2024 WL 776100, at *6 (D. Kan. Feb. 26, 2024) ("*First*, the court asks "whether the case involves an alleged violation of a constitutional right, applicable statute, or regulation, and whether intra-service remedies have been exhausted" . . . "*Second*, the court "evaluat[es] the scope and nature of the intervention into otherwise military affairs necessary to vindicate the alleged violation[.]" )).

  The Report provides that:

    Ewan fails at the first hurdle. Ewan has failed to demonstrate that the purpose for his wearing a beard is for expressive purposes protected under the First Amendment rather than for reasons of personal preference and thus failed to allege a violation of a constitutional right. *See, e.g*, *Palmer v. Commonwealth*, 14 Va. App. 346, 348 (Va Ct. App. 1992) ("The record shows that Palmer wore his hair and beard not for the purpose of expressive conduct but rather as personal preference."); *see also McCraw v. City of Okla. City*, 973 F.3d 1057, 1066 (10th Cir. 2020) ("Wilson has not alleged facts demonstrating that her jogging was expressive activity."); *see also Falcone v. Dickstein*, 92 F.4th 193, 207 (3rd Cir. 2024) (holding that an individual's refusal to wear a COVID mask at various local meetings to "silent[ly] protest" was not expressive conduct because it was "unlikely that a reasonable observer would understand her message simply from seeing her unmasked at the Board meeting."). . . . Ewan has not shown that growing a beard "would reasonably be understood by the viewer to be communicative" of a certain character trait . . . [and] has also failed to show that a reasonable observer would understand his message merely from seeing an individual with facial hair.

9

(Doc. 15–1, at 27–29.) The Report also provides that courts have long recognized that the military should be given wide discretion in regulating the conduct of its personnel, "including their personal appearance and grooming" and "[t]he grooming policy at the USDB satisfies several military and penological interests." *Id*. at 30 (citations omitted). Lastly, the Report provides that all four *Turner* factors weigh in favor of the USDB officials. *Id*. at 33–34.

### C. Abatement Days – Count III

Plaintiff Ewan claims that because the abatement policy is only applied prospectively it treats new inmates more favorably than older inmates. The Report provides that the "USDB declined to make the policy retroactive due to the strain on resources the retroactive policy would create." *Id*. at 34. The Report provides that the Court should also find this claim nonjusticiable under *Nauman* "because Ewan fails to demonstrate a violation of a constitutional right" and "[e]ven if the Court finds that Ewan has alleged a violation of a constitutional right, this Court should find the USDB's decision not to make the policy retroactive passes rational basis review." *Id*. at 35. The Report provides that:

> [T]he award of earned time for completion of certain treatment programs at the USDB is discretionary rather than mandatory. *Id.*; *see also* Ex. Q ("Abatement days are recommended when inmate has demonstrated an average or above average participation level and facilitators have endorsed it."). Abatement days are not guaranteed solely for participation in the treatment programs. Additionally, inmates may only earn up to 15 abatement days per month, so even if Ewan was eligible to receive the retroactive abatement days there is no guarantee that they would be awarded. Thus, he has failed to allege an entitlement or liberty interest for the purposes of the Due Process Clause and therefore has failed to demonstrate a constitutionally protected right.
> 
> Even if the Court finds that Ewan has properly alleged the violation of a constitutional right, the Court should still find that the USDB's decision not to make the policy retroactive survives rational basis review.

> It is Ewan's burden to demonstrate that there is no legitimate rational basis for the decision not to make the abatement days policy retroactive. *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010).
> The USDB declined to make the policy retroactive due to the administrative burden it would place on the USDB staff.
> Ewan alleges that this case is distinct from *Alexander v. Madden*, No. 15-cv-2498, 2018 U.S. Dist. LEXIS 106844 (S.D. Cal. Oct. 15, 2018), which denied a prisoner's request to preliminarily enjoin a policy which did not apply a change of good conduct time retroactively, because there are only 300-350 inmates at the USDB and it would not be overtaxing for the staff members to issue retrospective abatement days. (Doc. 11 at 10).
> There are currently 378 inmates incarcerated at the USDB. This does not account for the hundreds of military prisoners that have been transferred from USDB custody to the custody of the Bureau of Prisons (BOP). If the policy were retroactive, the USDB staff would be responsible not only for updating the records of inmates held at the USDB, but also identifying inmates who previously completed the qualifying programs and were subsequently transferred to BOP custody.
> The USDB staff is made up of civilians and uniformed personnel. The USDB currently has a staff of 111 civilian personnel and 444 uniformed personnel, divided between two military prisons on Fort Leavenworth, and 22 assigned uniformed personnel per shift, who oversee all 378 inmates. Because of Army personnel shortages, the uniformed correction specialists often must work 8-10 hour shifts and [sic] work. Therefore, even if there are fewer inmates updating numerous inmate records would impose enormous strain on the USDB's severely limited resources.
> This Court should dismiss Ewan's claim regarding abatement days because he has no constitutional right to abatement days, he has not completed programs eligible for abatement days, and the USDB is not required to make the policy retroactive. *See Boulden v. AG of N.M.*, 2024 U.S. Dist. LEXIS 101214 at *11-12 (D.N.M. June 6, 2024).

*Id*. at 37–38.

### III. Response Required

The Court will grant Plaintiffs an opportunity to respond to the Report and to show cause why their claims should not be dismissed for the reasons set forth herein, in the Court's MOSC II, and based on the Report. Plaintiffs should address whether or not their claims regarding their

12

rejected publications are now moot in light of the new policy.  Failure to respond by the deadline may result in dismissal of this action without further notice for failure to state a claim.

**IT IS THEREFORE ORDERED** that Plaintiff's shall have until **December 2, 2024,** in which to respond to the Report at Doc. 15 and to show good cause why their claims should not be dismissed.

**IT IS SO ORDERED**.

Dated November 1, 2024, in Kansas City, Kansas.

S/  John W. Lungstrum
JOHN W. LUNGSTRUM
UNITED STATES DISTRICT JUDGE